James A. WOOTEN, Plaintiff,

v.

Raymond W. MARSHALL, Defendant.

United States District Court
S. D. New York.
May 22, 1959.

See, also, 153 F.Supp. 759.

Schwartz & Nathanson, New York City, for plaintiff (George H. Schwartz, New York City, Paul E. Gelbard, New York City, of counsel).

Cadwalader, Wickersham & Taft, New York City, for defendant (Jacquelin A. Swords, Steve C. Dune, New York City, of counsel).

THOMAS F. MURPHY, District Judge.

This is an action for an accounting arising out of an alleged joint venture in the purchase of 160 acres of land known as the Young Tract in Anchorage, Alaska. Jurisdiction is based upon diversity.

Plaintiff was engaged in June of 1947 as president of Alaska Airlines. Defendant, who was chairman of the board, was principally responsible for his hiring.

One of the many problems of this small company in Anchorage, Alaska, was the paucity of housing facilities for its employees. It was plaintiff's testimony, which we accept, that he suggested to defendant the advisability of purchasing the Young Tract for the purpose of developing it for company employee housing and for their own account. Defendant was amenable to this plan and on a trip to the northwest preparatory to coming to Alaska he spoke to one of the owners, Dr. Young, in Portland, Oregon. Thereupon he arranged through plaintiff for Dr. Young to come to Anchorage for the purpose of her ascertaining the tract's value and speaking to others who had expressed interest in buying it. It was Dr. Young's impression that defendant was interested in the property as an officer of the airlines and that it was the airlines who would be the purchaser. She was flown to Alaska on a company pass and entertained at company expense despite the testimony of defendant that it was at his personal expense. Dr. Young was present at a number of dinner meetings with plaintiff and defendant and had come to no decision about selling the entire plot because she was interested in preserving to herself and her sister, the co-owner, a small income of $400 a year which they were receiving as rent from part of the land leased to the Civil Aeronautics Authority.

Before Dr. Young left Anchorage defendant made her a firm offer in writing to buy the property for $20,000 and an illusory promise guaranteeing her the equivalent of the $400 yearly rent by withholding half of the purchase price and placing it in a savings bank where the interest would almost equal the rent from the C.A.A.

In the meantime plaintiff and defendant had had many discussions concerning the potentials of the property, its value and what would be their offering price, and had reached an oral agreement whereby they agreed to buy the property, each contributing half of the purchase price, and agreed to share equally in the profits or losses of the enterprise. Subsequently this agreement was modified whereby defendant would advance the entire purchase price. This despite the fact that plaintiff had offered to put up his half, part of which he would have had to borrow, but the relations were such between the two that defendant patronizingly declined the proffer and insisted upon advancing the total amount himself

with the understanding, however, that if a few years went by without profits he would insist on interest for the part representing plaintiff's share that he was advancing. It was part of the agreement between plaintiff and defendant that all of the property would be sold except a portion along a bluff which they agreed to reserve to themselves and each would have the right to buy such portion of the property before it would be offered for sale to outsiders. They also discussed the possibility of building homes for themselves and developing housing for the personnel of the airlines. There was no specific agreement as to what each partner's duties would be other than a joint desire to dispose of the property at a profit.

Dr. Young finally agreed to sell the property and so advised defendant. She thereafter conveyed the property to defendant in his individual name, receiving from him the total purchase price of $20,000. This closing was done without plaintiff being advised of any of the details. Within a short time of the recording of the deed, however, plaintiff learned of defendant's duplicity and immediately advised him by letter. Plaintiff's letter and defendant's reply were as follows:

"I was quite surprised when I examined the Warranty Deed and find it is made out only in your name, and not in our joint names.

"Does this mean that I am no longer in this deal?

"I can let you have my check for $5,000 and I will sign a note for the other $5,000, to mature within one year, if this is satisfactory. You may hold the joint deed as security, and this should certainly be protection enough for this loan. May I hear from you."

"I have your memo of October 30th.

"I have paid the full price for the Young property and it is my understanding that whatever profits accrue they are to be divided equally between you and me. However if the investment should remain open for a considerable period of time I do feel that an interest charge would be proper.

"If you would prefer some other plan please do let me know."

Thereafter plaintiff made many efforts to exploit the property. He engaged surveyors, architects, made unsuccessful efforts at financing, followed up inquiries of purchase, attended tax hearings and in every instance kept defendant continuously advised.

The relations between the parties became strained because of allegations relating to plaintiff's management of the airlines and in November 1949 plaintiff severed his connection with the company and left Anchorage, never to return. Lawsuits and counter lawsuits were started and threatened and on a number of occasions talks relating to settlement were had between the parties. Although these talks related principally to the charges and countercharges concerning plaintiff's employment with the airlines the question of the Young property usually arose and defendant repeated and reaffirmed his oral and written promises that he and plaintiff were partners. However, defendant treated the property as his own and without consulting or advising plaintiff sold portions on three different occasions and received $151,542, no part of which he ever gave to plaintiff.

Defendant has vacillated in his pleadings, in his depositions and on trial. While first denying any agreement and pleading lack of consideration and the statute of frauds, he finally admitted an agreement and claims that the agreement arrived at between him and plaintiff was to the effect that they would buy the property, defendant advancing the capital, and plaintiff to exercise his best efforts to develop it, and if any profits resulted because of plaintiff's efforts in development, plaintiff was to share in such profits on a 50-50 basis. Defendant claims that plaintiff did not develop the property or exploit it and, according-

ly, has not performed in accordance with their agreement.

■■ We find that there never was such latter agreement and that the only agreement reached between the parties was that outlined above. Since we accept plaintiff's testimony that he and defendant were joint venturers in this property, and such agreement is not in violation of the statute of frauds, Wooten v. Marshall, D.C.S.D.N.Y.1957, 153 F.Supp. 759, plaintiff is entitled to a decree in equity for an accounting.

This opinion is filed in lieu of findings of fact and conclusions of law.

Decree accordingly.